UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal Case No. 26-mj-45 (KMM/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S POST-HEARING** |
| vs. | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF PRETRIAL MOTIONS** |
| JOSE ROBERTO RAMIREZ , | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Jose Roberto Ramirez, through undersigned counsel, hereby submits this Memorandum in support of his pretrial motions to suppress evidence, dismiss the case, and to disqualify military counsel.

**FACTS**

Deportation Officer Paul Rivera was hired by ICE as a deportation officer in September 2025. (Hearing Tr. 6:14-19). Rivera had prior experience in the military but no prior law enforcement training or experience. (Tr. 21:10-22:1). His training to be an ICE deportation officer was at an academy in Georgia and lasted roughly 1 1/2 months. (Tr. 22:8-23:6). Rivera started working on the street in about November, 2025. (Tr. 23:10-15). He therefore had about two months of experience at the time of the incident underlying this case. (Tr. 23:16-18). It was Rivera's understanding that he needed 100% certainty to make an arrest for violation of immigration law. (Tr. 24:11-22).

On January 8, 2026, Rivera was participating in "Operation Metro Surge" in Minnesota. (Tr. 7:16-18). Rivera had just arrived in Minnesota from Kansas City several

days before. (Tr. 27:3-14). He was assigned to conduct "targeted operations" to identify, locate, and arrest "known fugitives." (Tr. 8:23-9:6). The other members of Rivera's team had also just come from Kansas City. (Tr. 27:18-25).

The specific target on January 8 was a person named Charly Pallo Moreno, who Rivera claimed had a final order of removal and a violent criminal history. (Tr. 8:7-11, 9:4-9). The physical description ICE officers had of Moreno was that of "a male with medium complexion, black hair, with a Hispanic origin." (Tr. 8:20-23). It was Rivera's understanding that it was permissible to conduct a stop of anyone who matched that description. (Tr. 25:25-26:11). Rivera did not know how many millions of people fit that description, but he acknowledged that he himself fit that description. (Tr. 26:12-21). Rivera did not know how many Hispanic people lived in the area. (Tr. 51:8-13).

ICE officers conducted surveillance in the area of 2115 North Emerson Avenue in Minneapolis because that was Moreno's last known address according to ICE's database. (Tr. 9:10-22). Rivera did not know how many units this residence had or how many people lived in it. (Tr. 31:6-24). It was a densely populated area which a stip of residential houses. (Tr. 48:6-49:4). While conducting surveillance, ICE officers identified "a male Hispanic individual with black hair, medium complexion, in the driver's seat of a car parked right behind the target address. (Tr. 11:20-23). Officers had not actually seen anyone come from inside the home. (Tr. 32:7-12). Rivera and his team were confident that this individual was their subject. (Tr. 11:23-25). Rivera and his partner initiated a

stop as the targeted vehicle left the address. (Tr. 12:4-8). Two people whom Rivera believed were Hispanic fled from the vehicle, with one going back towards the target residence and the other fleeing towards a nearby McDonald's. (Tr. 12:9-18). Rivera and other agents on his team went to the McDonald's. (Tr. 12:17-13:8). After conducting surveillance at the McDonald's Rivera's supervisor decided to pull the officers back to the target residence. (Id.) A security guard at the McDonald's had demanded that the ICE officers leave. (Tr. 41:1-43:21).

Even though the person who had fled to the McDonald's was was determined not to be the suspect, officers still sought to stop, identify and investigate that person based on his association with a suspected "fugitive." (Tr. 33:15-35:17, 44:9-45:2). Neither of the individuals in the vehicle had been seen entering or exiting the residence at 2115 Emerson Avenue. (Tr. 38:22-39:4).

Agents then saw a BMW near the target residence with a driver was also "a male with black hair and a medium complexion with a Hispanic origin. (Tr. 13:20-14:6). Rivera identified Mr. Ramirez in Court as this individual. (Tr. 14:16-25). However, Mr. Ramierz was the only Hispanic looking male sitting in the well of the Court at the time and was sitting next to defense counsel. (Tr. 51:17-21). Mr. Ramirez's only common features with the target suspect were his black hair, medium complexion, and Hispanic appearance. (Tr. 51:22-51:10). Officers could not have concluded that he was the same person who had previously fled from them. (Tr. 52:17-53:17).

Rivera did not know where the BMW had come from but only that it was in the "general vicinity of the target address" as well as multiple other residences in the dense area. (Tr. 49:11-20). The person had not been seen entering or exiting 2115 Emerson Avenue. (Tr. 50: 17-23). Rivera could not recall what Ramirez or the person he previously observed was wearing. (Tr. 80:24-81:12). Officers concluded that this individual was their subject because he had been near the target residence and Rivera claimed he fled the ICE agents at high speeds. (Tr. 15:5-10). There was no speed radar gun, and Rivera could not say how fast Mr. Ramirez was driving. (Tr. 54:11-55:9). Rivera claims that officers attempted to initiate a stop by turning on their lights and sirens but the driver drove away at high speeds and running red lights. (Tr. 15:20-16:3). The ICE vehicle was not marked. (Tr. 40:5-8, 55:25-56:1). Rivera was aware that the day before this incident, ICE officers had shot and killed Renee Good on the streets of Minneapolis while she was in her vehicle. (Tr. 57:16-24). Officers then followed the vehicle from a distance until it stopped in a parking lot. (Tr. 16:6-21).

Rivera approached the vehicle and claims that he commanded the driver to roll down the windows, turn the car off, and place his keys and both of his hands outside of the vehicle. (Tr. 16:23-17:9, 58:21-59:1). Rivera claims that Mr. Ramirez responded by saying "Fuck I.C.E. and filing officers with his phone. (Tr. 17:10-13). Mr. Ramirez eventually exited the BMW and entered another vehicle in the vicinity. (Tr. 18:6-13). Rivera then approached Mr. Ramirez on the passenger side of that vehicle. (Tr. 18:15-20;

62:10-21). An officer opened the door to speak with Mr. Ramirez. (Tr. 62:24-63:5). Mr. Ramirez then stated that he had identification on him. (Tr. 18:20-21). Mr. Ramirez, however, was not able to find his identification. (Tr. 19:2-10, 64:3-9; Defense Exhibit 2 at 0:20-2:20). Mr. Ramirez's aunt who was the driver of the vehicle repeatedly tried to explain that she and Mr. Ramirez were citizens and were Natives. (Defense Exhibit 2 at 0:20-2:20). Rivera now realizes that Mr. Ramirez was not their target Charly Moreno and that Mr. Ramirez is a U.S. citizen who was born in this country. (Tr. 68:11-16).

Rivera claimed that he saw Mr. Ramirez reaching towards Rivera with an object. (Tr. 20:1-3, 70:23-71:1). Rivera knocked the object out of Mr. Ramirez's hand, with a quick swipe. (Tr. 20:5-6, 70:23-71:1, 72:9-74:2). The object was Mr. Ramirez's phone. (Tr. 71:2-4). Although Rivera claimed a belief that Mr. Ramirez was going to strike Rivera with the phone, Rivera acknowledged not knowing if that was Ramirez's intention. (Tr. 71:5-17). Rivera alleges that Ramirez called Rivera a name an threw a punch at Rivera's face. (Tr. 20:7-12). Rivera conceded he did not know Ramirez's intent, whether to be violent or defend himself from Rivera. (Tr. 74:3-25). Rivera punched Ramirez multiple times. (Tr. 75:22-76:13). Rivera and other officers then reached inside the vehicle and forcefully pulled Ramirez out and placed him under arrest. (Tr. 20:13-17, 75:1-6; Defense Exhibit 2 at 2:38-3:20).

**ARGUMENT**

**I.      EVIDENCE MUST BE SUPPRESSED DUE TO THE UNLAWFUL STOP AND ARREST.**

ICE agents stopped Mr. Ramirez based on racial profiling and without grounds to believe he was in violation of any immigration law. The stop in this instance violated both Mr. Ramirez's Fourth Amendment protection against unlawful seizures, and the Fourteenth Amendment guarantee of equal protection.

The government's briefing applies a reasonable suspicion standard to evaluating the stop of Mr. Ramirez. The "reasonable suspicion" standard that would normally apply to traffic stops by law enforcement agents is inapplicable in the instant case. The ICE agents did not have jurisdiction to enforce traffic or criminal laws, and were not claiming to be doing so.  Rivera and his "team" were deportation officers empowered to enforce civil immigration law to deport non-citizens illegally in the United States. On January 8, 2026, Rivera and his team were looking for a "fugitive" who had an outstanding order of removal. The ICE officers were not empowered to stop, detain or arrest U.S. citizens for any violation.  If immigration officers are permitted to stop anyone based merely on reasonable suspicion, citizens become in danger intrusions on their liberty without justification - as in the instant case. The applicable standard for involuntarily stopping Mr. Ramirez should therefore be probable case which is required for an actual arrest.

"The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had

committed or was committing an offense.'" <u>Gerstein v. Pugh</u>, 420 U.S. 103, 111-112, 420

U.S. 103 (1975)(quoting <u>Beck v. Ohio</u>, 379 U.S. 89, 91, 379 U.S. 89 (1964)). It requires

"more than a reasonable, articulable suspicion that a person committed a crime." <u>Bell v.</u>

<u>Neukirch</u>, 979 F.3d 594, 603 (8th Cir. 2020). There must be a "fair probability" or

"substantial chance" that the person has committed an offense. <u>Illinois v. Gates</u>, 462 U.S.

213, 243 n.13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983).

However, even if a standard of reasonable suspicion is applied to the stop of Mr.

Ramirez, that standard was not met. "A traffic stop constitutes a seizure and therefore

must be supported at least by reasonable suspicion." <u>United States v. Guzman</u>, 926 F.3d

991, 997 (8th Cr. 2019).  An officer has reasonable suspicion "when he has 'a

particularized and objective basis for suspecting the particular person stopped of criminal

activity.'" <u>Kansas v. Glover</u>, 589 U.S. 376, 380 (2020) (quoting <u>United States v. Cortez</u>,

449 U.S. 411, 417–18 (1981)).  A "mere hunch does not create reasonable suspicion."

<u>Navarette v. California</u>, 572 U.S. 393, 397 (2014). "Except at the border and its functional

equivalents, officers on roving patrol may stop vehicles only if they are aware of specific

articulable facts, together with rational inferences from those facts, that reasonably

warrant suspicion that the vehicles contain aliens who may be illegally in the country."

United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975).

In the instant case, the only grounds for stopping Mr. Ramirez was that he had dark

hair, medium skim complexion, appeared to be Hispanic, and was see driving in the

vicinity of a residential address in a densely populated urban neighborhood where officers had information that a fugitive may be residing. Rivera never actually saw Mr. Ramirez enter or exit 2115 Emerson Avenue North, but merely saw him driving in the area. The only basis for suspicion was his ethnicity. Based on the standards applied, any Latino male could be subject to an intrusive stop by immigration officers.[1]

The Supreme Court has held that where the occupant of a vehicle appears to be of Mexican descent,

> this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens.

Brignoni-Ponce, 422 U.S. at 886. The same observations hold true in the instant case. There are many people in and around Minneapolis who have physical characteristics identified with Hispanic ancestry. Many might not actually be Hispanic. Indeed Mr. Ramirez is part Latino and part Native American. More so than in a border area, a small proportion of people in Minneapolis who have physical characteristics identified with being Hispanic are aliens, much less in the country illegally.

---

[1] According to City of Minneapolis demographic data, there were 42,067 Hispanics living in the City as of 2022. www.minneapolismn.gov/government/government-data/datasource/neighborhood-demographics-dashboard/ There were 1192 Hispanics living in the neighborhood of Jordan where the residence was located. Id.

This case stands in contrast to a citation relied upon by the government, United States v. Lopez-Tubac, 943 F.3d 1156 (8th Cir. 2019) which upheld the validity of a stop by an immigration officer based on a belief that the suspect was in the country illegally. In Lopez-Tubac, the suspect was actually seen exiting a residence and entering his vehicle, where the suspect listed that address as his residence, the vehicle in which he was arrested was registered to the address, and the manager of the mobile home park had confirmed that the suspect lived at that address. 943 F.2d at 1158, 1159-1160. In the instant case, there was no comparable confirmation that the suspect lived at the address in question, that he was actually at the residence, or that the vehicle he was driving was connected to the residence. The involuntary stop of Mr. Ramirez based merely on very general physical characteristics and Hispanic appearance, and because he was driving in proximity to the suspected residence of a target suspect cannot be deemed permissible.

The evidence leading to Mr. Ramirez's arrest must also be suppressed because of the discriminatory nature of the stop based on his perceived ethnicity which violated is Fourteenth Amendment right to equal protection. "The Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause." Whren v. United States, 517 U.S. 806, 813 (1996); see also Trump v. Illinois, 146 S. Ct. 432, 436 n. 4 (2025)("the officers must not make interior immigration stops or arrests based on race or ethnicity" citing Whren). In the instant case, where deportation

officers stopped Mr. Ramirez based principally and almost exclusively on his perceived ethnicity, the upholding of the fundamental right to equal protection requires that evidence of subsequent conduct be suppressed.

The government next argues that Mr. Ramirez's alleged resistance to deportation officer Rivera provided independent probable cause of arrest. The confrontation giving rise to the charge in this case occurred as a result of the improper racial profiling stop, and the further intrusive conduct by officers when they involuntarily opened the door to the vehicle and Rivera then knocked Ramirez's cell phone out of his hand. Although force is generally not justified to resist arrest, "an individual may be justified in using force to resist excessive force used by a law enforcement officer." United States v. Drapeau, 644 F.3d 646, 654 (8th Cir. 2011)(citing United States v. Taken Alive, 262 F.3d 711, 714 (8th Cir. 2011). The Supreme Court has applied in criminal case he common law rule that "if the officer have no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest."Bad Elk v. United States, 177 U.S. 529, 535 (1900); see also Von Kahl v. United States, 242 F.3d 783, 790 (8th Cir. 2001)(recognizing the common law right set forth in Bad Elk without addressing whether it is still good law).

Mr. Ramirez reacted to the racial profiling by federal officers based on fear that he would be the next Renee Good whom immigration officers had murdered the previous day. When officer opened the door to Mr. Ramirez's vehicle without consent, and then

violently knocked the cell phone out of his hand, Mr. Ramirez reflexively hit officer Rivera in self-defense. His actions were reasonable and authorized under the law, and should not serve as a basis to excuse the violations of is Fourth and Fourteenth Amendment rights.

## II. THE EVIDENCE DEMONSTRATES OUTRAGEOUS CONDUCT.

The testimony by deportation officer Rivera established that the activities by him and other officers were part of a massive racial profiling operation and that Mr. Ramirez was a specific victim. The government, in its response to this motion, provides links to various publications of government propaganda to justify or support its actions. (Doc. 36 at 2-3). Objective independent evidence established otherwise. See e.g. Human Rights Watch, "A Manufactured Crisis" Minnesota Communities Terrorized by the Federal Government, 2026, www.hrw.org/sites/default/files/media_2026/06/us_minneapolis0626%20web_0.pdf As Human Rights Watch's summary explained, " The Trump administration's deployment of thousands of federal immigration agents to Minnesota between December 2025 and March 2026 led to widespread human rights violations, terrorized residents with long-lasting effects, and spotlighted the deeply abusive patterns in US immigration enforcement."www.hrw.org/news/2026/06/18/us-federal-government-terrorized-minnesota-communities . The report specifically noted, "Federal agents appear to have engaged in widespread and routine racial profiling by stopping, arresting, or detaining individuals on

the basis of their race or ethnicity." <u>A Manufactured Crisis</u> at 31. "Minnesota residents of Somali and Latin American descent were notably targeted, despite the fact that the overwhelming majority of these communities are US citizens or have green cards." <u>Id</u>. at 32.

This Court has specifically found that residents were systematically stopped and questioned based on race and ethnicity. Findings of Fact and Conclusions of Law, Hussen v. Noem, Case No. 0:26-cv-00324 (D. Minn., filed March 9, 2026), pp. 75-77, 93. Officer Rivera's testimony provided further specific examples of racial profiling including the stop of Mr. Ramirez. After stopping Mr. Ramirez based on racial profiling, officers intrusively and involuntarily opened the door to the vehicle in which he was a passenger, then violently knocked the phone out of his hand, and they violently removed him from the vehicle. The video taken by Mr. Ramirez's aunt, Defense Exhibit 2, shows how officers were violent and brutal in their treatment of Mr. Ramirez.

The government asserts that their conduct was part of some sort of lawful and legitimate operation. The public record and court record, and the record in this case refutes these claims. Mr. Ramirez was one of countless victims of the Trump regime's fascist and racist terror campaign against residents of the Twin Cities area. Based on the case law provided in the original motion and in the government's memorandum, this is the sort of extraordinary case of government misconduct that justifies a finding that the

government's violation of Mr. Ramirez's substantive due process rights was so egregious as to warrant dismissal.

## III.    THE MILITARY PROSECUTOR MUST BE DISQUALIFIED.

Mr. Ramirez's original motion to disqualify military counsel set forth authority and incorporated by reference another brief which set forth the use of prosecutors who are active military officers is prohibited under the Posse Comitatus Act.  The government's arguments to the contrary are unavailing.

### A.    Neither Statute at issue here ExpresslyAuthorizes DOJ use of JAG Officers to Prosecute Civilians Absent a Military Nexus.

#### 1.    Congress Only "Expressly Authorizes" an Exception to the PCA When It Announces the Exception Explicitly, Particularly, and with Specificity.

Congress was clear about what constitutes an exception to the Posse Comitatus Act: an express provision by either the Constitution or by Congress itself. *Newsom v. Trump*, 797 F. Supp. 3d 1092, 1122 (N.D. Cal. 2025). The plain meaning of "expressly" is "explicitly," "particularly," and "specifically." Merriam-Webster Dictionary (2026). This meaning is consistent with how the drafters of the PCA understood the term. The word "expressly" was added to the statute to address concerns of the House manager, who "believed that retention of the word 'expressly' was important to prevent the use of the Army wherever implied authority could be inferred . . . ." Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 28–29 (Nov. 6, 2018). Thus, in order for Congress to authorize an

exception to the PCA, it must do so, explicitly, particularly, and with specificity. Under the plain language of the statute, authority to violate it cannot be implied or inferred.

### 2. The Supreme Court's Anti-Injunction Act Jurisprudence Provides a Framework For Analyzing Statutory Exceptions to the PCA.

Scant case law addresses the PCA, let alone the application of its "expressly authorized" exception language. But the Supreme Court has addressed identical language contained in another statute – the Anti-Injunction Act. The Anti-Injunction Act "imposes an absolute ban upon the issuance of a federal injunction against a pending state court proceeding . . . ." *Mitchum v. Foster*, 407 U.S. 225, 229 (1972). Like the PCA, however, the Anti-Injunction Act provides that an Act of Congress may "expressly authorize" an exception to that ban. It states, "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

In *Mitchum*, the Supreme Court laid out the rules to apply when determining whether an Act of Congress "expressly authorizes" an exception to the Anti-Injunction Act. First, the Court held, "in order to qualify under the 'expressly authorized' exception of the anti-injunction statute, a federal law need not contain an express reference to that statute." *Id.* at 237. Second, a federal law need not expressly authorize an injunction of a state court proceeding to qualify as an exception. *Id.* Third, "in order to qualify as an

14

'expressly authorized' exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Id.* In short: "The test . . . is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." *Id.*

In other words, "express authorization" occurs only when an Act of Congress is, "on its face and in every one of its provisions . . . totally incompatible with the prohibition [to which the exception applies]." Here, then, for a statute to "expressly authorize" DOJ to use JAG officers to prosecute civilians in civilian court for purely civilian offenses – conduct against which the PCA imposes an "absolute ban" absent some statutory exception – the statute must "on its face and in every one of its provisions . . . [be] totally incompatible" with the PCA. Neither 28 U.S.C. § 543 nor 10 U.S.C. § 806(e)(1) surmount this bar.

In conducting this analysis, the Supreme Court looks to the legislative history of the statute at issue to determine whether it "could be given its intended scope" only through an exception to the Anti-Injunction Act. For example, in *Vendo Co. v. Lektro-Vend Corp.,* 433 U.S. 623, 624 (1977) the Court explained:

> [the Clayton Act] does not meet the second part of the *Mitchum* test; it is not an "Act of Congress . . . (which) could be given its intended scope only by the stay of a state court proceeding," Crucial to our determination in *Mitchum* . . . [was] our review of the legislative history of s 1983; similar

> review of the legislative history underlying s 16 demonstrates that that section does not meet this aspect of the *Mitchum* test.

*Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 632–33 (1977).

Further, in *Vendo*, the Supreme Court observed that the few statutes which it had recognized as "expressly authorized" exceptions to the Anti-Injunction Act, "while not directly referring to s 2283, have nonetheless explicitly authorized injunctive relief against state-court proceedings. . . . By limiting the statutory exceptions of s 2283 and its predecessors to these few instances, we have clearly recognized that the Act countenancing the federal injunction must necessarily interact with, or focus upon, a state judicial proceeding." *Vendo*, 433 U.S. at 640-641.

In sum, when considering whether an Act of Congress "expressly authorizes" an exception to the absolute prohibition of the Anti-Injunction Act, the Supreme Court examines the legislative history of the statute and the circumstances of its enactment to determine its "intended scope." The Supreme Court then asks whether the Act of Congress "could be given its intended scope only by the stay of a state court proceeding" in contravention of the Anti-Injunction Act.

The *Mitchum/Vendo* test is appropriate for use here. The PCA uses nearly identical language to the Anti-Injunction Act. Mirroring the Anti-Injunction Act, the PCA imposes an absolute ban on civilian use of the military to enforce civilian laws absent an Act of Congress expressly authorizing some exception to that ban. And like the Anti-Injunction

Act, the PCA is tied to fundamental American principles about the separation of powers and how we organize our democracy that cannot be derogated lightly.

### 3. The Supreme Court's Implied Repeal Doctrine Is Instructive Here.

The Supreme Court's case law discussing when a statute can overrule a prior statute by implication is also instructive here. It applies a similar analytic framework as *Mitchum* and *Vendo*, though it does so in the absence of statutory language requiring that any exception to the prior statute be "expressly authorized."

In *Morton v. Mancari*, for example, the Supreme Court considered whether the Equal Opportunity Act, which purported to eliminate racial hiring preferences, had effectively repealed a prior statute requiring that the BIA grant hiring preference to Native Americans. 417 U.S. 535, 537-538 (1974). The Supreme Court concluded it had not, explaining: "In the absence of some affirmative showing of an intention to repeal [an earlier statute], the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable . . . ." *Id.* In reaching this conclusion, the Supreme Court observed, "there is nothing in the legislative history . . . that indicates affirmatively any congressional intent to repeal the 1934 preference. Indeed, as explained above, there is ample independent evidence that the legislative intent was to the contrary." *Id.* at 550.

Thus, the Supreme Court's "implied repeal" doctrine mirrors its analysis in the Anti-Injunction Act cases. Under both approaches, the Supreme Court looks to whether

17

the later statute is entirely incompatible with the prior statute before deciding whether the later statute effectuated a repeal or expressly authorized an exception to it. And under both approaches, the party arguing for repeal or exception has a high burden to meet, and the legislative history and background of the later statute's enactment is critical to the analysis. *E.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow.") (internal quotations omitted).

### 4. 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) Do Not Satisfy the *Mitchum/Vendo* Test With Respect to the PCA.

With these principles in mind, we can turn to consideration of the statutes at issue here. 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) are two Acts of Congress which created exceptions to the PCA. Evaluating these statutes under the framework set forth in *Mitchum* and *Vendo* demonstrates, however, that neither statute "expressly authorizes" an exception to the PCA's absolute prohibition on DOJ use of JAG officers to prosecute civilians absent some military purpose or nexus.

28 U.S.C. § 543 states: "The Attorney General may appoint attorneys to assist United States attorneys when the public interest so requires, including the appointment of qualified tribal prosecutors and other qualified attorneys to assist in prosecuting Federal offenses committed in Indian country."  Section 543 provides a general grant of authority to the Attorney General to appoint non-DOJ lawyers as SAUSAs. It does not, however,

reference the military, let alone "explicitly," "particularly," and "specifically" articulate that DOJ can use JAG officers to prosecute civilians in civilian court. Thus, on its face the statute does not "expressly authorize" such use in contravention of the PCA's absolute prohibition.

Applying the Supreme Court's test for "express authorization" in *Mitchum* and *Vendo* leads to the same conclusion. While *Vendo* and *Mitchum* arise in the Anti-Injunction Act context, the Supreme Court's reasoning reflects a disciplined approach to "expressly authorized" exceptions: a statute does not qualify merely because it is related to the subject matter; it must be the kind of legislation ***that requires the exception*** to achieve its intended scope.

While 28 U.S.C. § 543 includes the possibility of military lawyers serving as SAUSAs while detailed to DOJ, nothing in that description establishes that section 543 can be given its intended scope ***only*** by authorizing the military to engage in direct civilian law enforcement activity prohibited by the PCA. Therefore, under the narrow "express authorization" test established in *Mitchum/Vendo*, section 543 does not expressly authorize DOJ's use of JAG officers to prosecute civilians in civilian court for purely civilian offenses.

Notably, the House Judiciary Committee, which has primary legislative and oversight jurisdiction over the DOJ, has stated in an official report accompanying legislation: "The Committee is fully aware that exceptions to the 'Posse Comitatus'

prohibition involving military personnel as participants in civilian law enforcement activities must be narrow and should be authorized only when absolutely necessary." H.R. Rep. 97-624, at 10–11 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 3229, 3238–39. This clear statement of legislative intent runs counter to Judge Elkins's conclusion – and the government's arguments thus far – that section 543 creates a broad authority for DOJ to use military lawyers as SAUSAs for any purpose and without any practical limitation on the number, circumstances, context, duties, supervision, or authority vested in those JAG SAUSAs. Under the government's reading of section 543, DOJ could fire all the civilian line attorneys in the District of Minnesota and replace them with JAG officers, an absurd and obviously unlawful prospect at odds with our historical aversion to military involvement in civil affairs.

Congress' intended scope of 806(e)(1) and 973(b) is limited to JAG prosecutions of civilians that have a military purpose or nexus. 10 U.S.C. § 806(e)(1) states:

> A judge advocate who is assigned or detailed to perform the functions of a civil office in the Government of the United States under section 973(b)(2)(B) of this title may perform such duties as may be requested by the agency concerned, including representation of the United States in civil and criminal cases.

10 U.S.C. § 973(b)(2)(B) states: "An officer to whom this subsection applies may hold or exercise the functions of a civil office in the Government of the United States . . . when assigned or detailed to that office or to perform those functions."

The legislative history of 10 U.S.C. § 806(e)(1) and 973(b) shows that the "intended scope" of these statutes did not include authorizing DOJ to use JAGs in direct contravention of the PCA.

A House report accompanying the enactment of section 973(b) stated it that its purpose was to "clarify the limitation on performance of civil functions by commissioned officers contained in section 973 of title 10, United States Code." H.R. CONF. REP. 98-352, 233, 1983 U.S.C.C.A.N. 1160, 1170. The House Report further stated:

> The clarification was necessary to permit military personnel assigned to Judge Advocate General's Corps duties to continue assisting attorneys in the Department of Justice *with cases related to military installations and other military matters*. The clarification is not intended to encourage substitution of military officers for civilian personnel *in areas unrelated to the military*.

*Id.* (emphasis added).

The Senate report said essentially the same thing. *See* S. Rep. No. 98-174, at 232–33 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 1081, 1121–22. It explained:

> By specific agreement, since 1942 military attorneys have been authorized by United States Attorneys to prosecute before federal civilian courts petty offenses committed on military installations. In 1982, more than 70,000 such offenses were prosecuted by military attorneys performing as Special United States Attorneys before United States Magistrates.
>  . . .
> The committee has been advised [that the OLC] has recently issued an opinion that the practice of appointing military commissioned officers as special assistant United States Attorneys is now considered to offend the prohibitions of section 973(b) of Title 10, United States Code. However, that same opinion suggests that legislation be sought to amend section 973(b) to permit the continuation of this longstanding and successful practice.

> Therefore, the Committee recommends a provision to amend section 973(b) of title 10 to permit the continuation of this practice of utilizing military attorneys as Special Assistant United States Attorneys. The committee provision would completely rewrite section 973(b) to conform the language of that section to the interpretation having previously been given by the executive branch to the existing section. *This provision does not sanction or endorse any use of military attorneys beyond that permitted under that interpretation.*

S. REP. 98-174, 232-33, 1983 U.S.C.C.A.N. 1081, 1122-23 (emphasis added).

Notably, neither of these reports even mention the PCA, let alone suggest that the intended scope of section 973(b) is to expressly authorize an exception to the PCA allowing the DOJ to use JAG officers to prosecute civilians in civilian court for purely civilian offenses. Rather, the reports are clear: Congress intended to codify the existing understanding and arrangement by which JAG officers sometimes worked as SAUSAs on cases with a military nexus, all of which is consistent with the military purpose doctrine. Congress was careful to note in both the House Report and the Senate Report that the intended scope of the legislation *did not* include expanding the role of military officers serving as SAUSAs beyond the historical practice of prosecutions with a military purpose. *See also* H.R. Conf. Rep. No. 99-1001, at 493 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 6529, 6552 (explaining that the scope of 10 U.S.C. § 806(e)(1) was limited to situations where JAGs were detailed to DOJ to assist with "litigation involving the Department of Defense").

Sections 806(e)(1) and 973(b), even when read together, do not expressly authorize the DOJ to use JAG officers to prosecute civilians in civilian court in direct contravention

of the PCA. First, the plain language of 10 U.S.C. § 806(e)(1) provides that JAG officers detailed to a civil office may only perform "such duties as *may be requested* by the agency concerned . . ." (Emphasis added.) DOJ may request JAG officers to participate in cases with a military nexus consistent with the military purpose doctrine without running afoul of the PCA. But no statute expressly authorizes the DOJ to use JAG officers to prosecute civilians in civilian court under any other circumstances. Put differently, DOJ "*may not request*" JAG officers to prosecute civilians in violation of the PCA – at least not lawfully – and thus 10 U.S.C. § 806(e)(1) does not permit JAG participation in such an arrangement.

Second, as with 28 U.S.C. § 543, applying the *Mitchum/Vendo* test to section 806(e)(1) leads to the conclusion that it does not expressly authorize an exception to the PCA. Under *Mitchum/Vendo*, the question here "is whether [10 U.S.C. § 806(e)(1)] . . . could be given its intended scope only by" permitting the use of JAGs to prosecute civilians in civilian court for purely civilian offenses. *See Mitchum*, 407 U.S. at 237.

As *Vendo* explained, determining whether a statute "expressly authorized" an exception to a prior statute requires review of the later statutes legislative history to determine its intended scope. Judge Elkins declined to consider the legislative history discussed above. But that history clearly indicates Congress' "intended scope" of sections 806(e)(1) and 973(b) did not include expressly authorizing an exception to the PCA's "absolute ban" on DOJ use of military officers to prosecute civilians in civilian court.

Thus, it is not true that 10 U.S.C. § 806(e)(1) can *only* be given its intended scope by reading it as an exception to PCA. Congress' clear understanding in enacting section 806 was that they were merely authorizing the extant practice, which does not violate the PCA because it is not strictly civilian law enforcement, of DOJ using JAGs as SAUSAs in cases with a military nexus. Put differently, section 806 is "given its intended scope" by reading it as a UCMJ housekeeping provision confirming that otherwise lawful JAG litigation does not violate the UCMJ. It need not serve as a PCA exception to achieve its intended scope. Under the *Mitchum/Vendo* test, then, section 806(e)(1) does not "expressly authorize" an exception to the PCA.

For all these reasons, the contention that that 10 U.S.C. § 806(e)(1) expressly authorizes the DOJ to use JAG officers to prosecute civilians in civilian court for purely civilian offenses is incorrect.

### 5.  The Statues That Do Expressly Authorize a PCA Exception Are Clear, Specific, and Explicit About the Exception.

Finally, there are numerous statutes that *do* "expressly authorize" civilian use of the military and constitute exceptions to the PCA, all of which satisfy the *Mitchum/Vendo* test. Some contain an express reference to the PCA itself. *E.g.,* 5 U.S.C. § 408(g) (specifically referencing "section 1385 of title 18). Others expressly authorize civilian use of the military contain specific reference to the relevant branches of the military. *E.g.,* 16 U.S.C. § 23 (authorizing the "necessary details of troops" for protection of Yellowstone National Park when requested by the Secretary of the Interior); 18 U.S.C. 112(f)

(referencing the "Army, Navy, and Air Force); 18 U.S.C. § 351 (same); 18 U.S.C. § 1116 (d) (same); 18 U.S.C. § 1201(f) (same); 18 U.S.C. § 1751(i) (same); 18 U.S.C. § 831(e), (f) (explaining that "the Attorney General may request assistance from the Secretary of Defense . . . [and DOD] personnel"); *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1164 (9th Cir. 2022) (explaining that National Defense Authorization Act provided "express authorization" for Border Patrol to use U.S. Marines to conduct border surveillance because the statute's plain language specifically authorizes such participation by the Marines).

Together, these statutes illustrate the "commonly accepted proposition" that "the phrase 'in cases and under circumstances expressly authorized by . . . Act of Congress' demands that the statutory exception specifically refer to some form of military assistance." *See Elsea*, R42659, supra, at 34 (emphasis added).[3] As Judge Charles Breyer wrote recently in *Newsom v. Trump*, "a close look at the recognized statutory exceptions to the [PCA]" reveal many "apply only in very specific circumstances," "are narrow," and "do not undermine the whole act." 797 F. Supp. 3d 1092, 1116 (N.D. Cal. 2025). These exceptions are relevant here because they show that Congress knows how to expressly authorize a PCA exception when it wants to do so.

### 6. The *Allred* Case is Inapposite.

The government cites *United States v. Allred*, 867 F.2d 856, 858-59 (5th Cir. 1989) to support its contention that 28 U.S.C. § 543 authorizes JAG officers to appear. But this

case is nothing like *Allred*. First, the prosecutor in *Allred* was a U.S. Air Force JAG officer who had been sworn in as a special assistant to the United States Attorney to assist with the investigation and prosecution of one case involving contractor fraud on the air force base where the JAG officer was stationed. *Allred*, 867 F.2d at 870-871. The JAG officers assigned to the U.S. Attorney's office for the District of Minnesota are prosecuting multiple cases in this District. None involve the military in any way, let alone crimes committed against the Army on the base where they are stationed. The longstanding concerns about undue influence of the military on civilian law enforcement are entirely absent from *Allred*.

Moreover, *Allred* simply gets the analysis of these statutes wrong. As discussed above, 28 U.S.C. § 543 does not expressly grant authority for the DOJ to co-opt military lawyers to serve in a civilian capacity. Nor does 10 U.S.C. § 806(d)(1). *Allred* does not grapple with the legislative history and background of the statutes at issue, history which confirms, among other things, that the intended scope of 10 U.S.C. § 806(e)(1) extends only to the participation of JAG officers in civilian court in cases with a military purpose or nexus.

### B.    DOD Regulations Prohibit JAG Officers' Appearance in this Case.

In 1981, Congress delegated to the Secretary of Defense the task of promulgating regulations to ensure military personnel did not directly participate in civilian law

enforcement. The statute states:

> The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

10 U.S.C. § 275.

The Army's own regulations preclude the prosecution of Mr. Ramirez's wholly civilian case by military officers. Specifically, 32 C.F.R. § 516.4 limits Army JAG officers to appearing as SAUSAs in cases, "in which the Army has an interest." 32 C.F.R. § 516.4(e). This is not such a case. The Army has no interest in prosecuting Mr. Ramirez for a misdemeanor violation of 18 U.S.C. § 111 involving alleged interference with an ICE or CBP agent. Similarly, per Army Regulation 27-10, ¶ 23-5(a), *Military Justice* (8 January 2025), Army JAG officers may prosecute misdemeanors in civilian court only where the misdemeanor was committed on a military installation. The allegations against Mr. Ramirez do not involve a military installation or even military personnel.

In short, the appearances by JAG officers in this case do not even comport with the Army's own regulations, let alone the PCA. If 10 U.S.C. § 806 meant to authorize JAG officer participation in purely civilian prosecutions, it would make no sense for the Army to forbid it via its own regulations.

**C.      The Court Can and Should Disqualify JAG Officers.**

Where an attorney's appearance would violate the law or the court's rules, the

Court must strike that appearance. *E.g., Adolph v. Indiana Gaming Comm'n,* No. 1:09-

CV-1396-SEB-TAB, 2010 WL 3447554, at *1 (S.D. Ind. Aug. 30, 2010) (striking

attorney appearances where they would have violated the False Claims Act); *Wilhelm v.*

*City of Calumet City, Illinois*, No. 04 C 4272, 2005 WL 8179057, at *1 (N.D. Ill. May 11,

2005) (granting motion to strike appearance where attorney had impermissible conflict of

interest).

The Court should exercise that authority here. "Agencies must follow their own

regulations." *Sarail A. v. Bondi*, 803 F. Supp. 3d 775, 779 (D. Minn. 2025) (citing *United*

*States ex rel. Accardi v.Shaughnessy*, 347 U.S. 260, 268 (1954)). "Federal regulations

have the force and effect of law," *Resol. Tr. Corp. v. Home Sav. of Am.*, 946 F.2d 93, 96

(8th Cir. 1991), and courts can remedy their violation. *See, e.g., Service v. Dulles*, 354

U.S. 363, 388 (1957) (holding federal government employee's dismissal invalid when

agency regulations were violated); *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959) (same).

Moreover, the Court is not powerless in the face of a PCA violation. As the

Supreme Court explained in *Laird v. Tatum*:

> . . . when presented with claims of judicially cognizable injury resulting
> from military intrusion into the civilian sector, federal courts are fully
> empowered to consider claims of those asserting such injury; there is
> nothing in our Nation's history or in this Court's decided cases, including
> our holding today, that can properly be seen as giving any indication that

28

actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

408 U.S. at 15–16. More fundamentally, the Court cannot countenance a felony by allowing DOJ to use JAG officers to prosecute Defendant in violation of the PCA. As the court explained in *Newsom v. Trump*:

> The Posse Comitatus Act does not provide a private cause of action for damages. . . But a plaintiff can still bring an *ultra vires* claim where, as Plaintiffs assert is the case here, an "agency has disregarded a specific and unambiguous statutory directive" or "has violated some specific command of a statute."

786 F. Supp. 3d 1235, 1258 (N.D. Cal. 2025). That is exactly what has happened here. DOJ is continuing with the use of a JAG to prosecute Mr. Ramirez in direct violation of the PCA as well as the Army's own regulations. Robert Tucker's appearance should be struck to put an end to the *ultra vires* conduct, and no further active military officers should be permitted to prosecute this case. (Tucker is the third JAG officer to appear).

## CONCLUSION

For the foregoing reasons, Mr. Ramirez respectfully requests that the Court grant his motion to dismiss this case, or in the alternative to grant his motions to suppress

evidence and to disqualify military counsel.

Dated:  June 28, 2026                     LAW OFFICE OF JORDAN S. KUSHNER

By s/Jordan S. Kushner
JORDAN S. KUSHNER
Attorney ID 219307
Attorney for Defendant
431 South 7th Street, Suite 2446
Minneapolis, Minnesota  55415
(612) 288-0545
jskushner@gmail.com