UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal Case No. 26-mj-45 (KMM/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. JOSE ROBERTO RAMIREZ, Defendant. | ) | **DEFENDANT'S OBJECTIONS TO ORDER & REPORT AND RECOMMENDATION FILED ON AUGUST 21, 2026** |

Defendant Jose Roberto Ramirez, through undersigned counsel hereby objects to the Magistrate Judge's Order & Report and Recommendation filed on August 21, 2026 (Doc. 64/65). Mr. Ramirez objects to the R&R's conclusions and its recommendations to deny his motions to dismiss based on outrageous government conduct (pages 5-7, 30), and to partially deny his motion to suppress evidence from government agents' unconstitutional stop and seizure (pages 7-22, 30). Mr. Ramirez further objects to and appeals the Magistrate Judge's Order denying his motion to disqualify military counsel from prosecuting this case (pages 22-27, 30). These Objections are filed pursuant to 28 U.S.C. § 636(b)(1)(A-C), Fed. R. Crim. P. 72(a, b) and Local Rule 72.2(a, b). Mr. Ramirez requests a full *de novo* review of the Recommendations to deny his motions. He further submits that the Order denying his motion for disqualification was clearly erroneous and contrary to the law.

## FACTS

Mr. Ramirez adopts and incorporates by reference the facts set forth by the R&R in its Findings of Fact (Doc. 64 at 2-4) and in the course of its analysis of Mr. Ramirez's motion to suppress evidence (Doc. 64 at 9-20). The R&R explains in detail how ICE agents stopped and seized Mr. Ramirez without any substantive basis based on blatant racial profiling, and how the testifying ICE Deportation Officer Paul Rivera was not credible.

## ARGUMENT

### I. DISMISSAL BASED ON OUTRAGEOUS CONDUCT IS WARRANTED.

The R&R astutely recognized from the beginning, "In any ordinary sense of the word, the Government's conduct in this case is outrageous." (Doc. 64 at 1). However, the Magistrate Judge's conclusion that the conduct "falls short of the narrow legal definition of that term" (Id.), was based on an overly narrow interpretation of the applicable case law.

The Supreme Court first recognized a due process violation based on outrageous conduct in a case that had nothing to do with entrapment. Rochin v. California, 342 U.S. 165, 172 (1952) held that police conduct shocked the conscience which consisted of "Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents." Rochin has never been overruled. In Fikes v. Alabama, 352 U.S. 191, 1 L. Ed. 2d 246, 77 S. Ct. 281

(1957), the lengthy detention, the intermittent "horse-shedding" of the accused until a confession resulted were sufficient in combination to persuade Justice Frankfurter to concur with the majority's decision to reverse.

An 8th Circuit decision rejected outrageous conduct based on entrapment, recognizing, "This type of government conduct stands in stark contrast to the law enforcement conduct condemned by the court in Rochin v. California, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952), where government agents illegally broke into the privacy of the petitioner, engaged in a physical struggle to open his mouth and remove its contents, and forcibly extracted the contents of his stomach." United States v. York, 830 F.2d 885, 891 (1987). Even the 8th Circuit cases cited by the R&R which note that the doctrine of outrageous conduct has been applied almost exclusively in cases involving entrapment do not hold that outrageous conduct is limited to cases involving entrapment. United States v. Combs, 827 F.3d 790, 794-795 (8th Cir. 2016) explains,

> Like the Supreme Court in United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973), our cases have left open the possibility that, in rare instances, the investigative methods employed by law enforcement could be "so outrageous that due process bars the government from invoking the judicial process to obtain a conviction." United States v. King, 351 F.3d 859, 867 (8th Cir. 2003). If applicable, this defense would be "reserved for conduct that falls within the narrow band of the most intolerable government conduct," id. (internal quotation omitted), namely, actions "violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause."

(citing Russell, 411 U.S. at 432 and Hampton v. United States, 425 U.S. 484, 492-96, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976) (Powell, J., concurring); id. at 496-97 (Brennan, J.,

dissenting). Although egregious cases of entrapment can potentially constitute outrageous conduct, the language of Combs does not suggest that outrageous conduct is limited to such cases. Rather, it is "reserved for conduct that falls within the narrow band of the most intolerable government conduct . . . namely, actions violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause." Id. at 795.

United States v. Boone, 437 F.3d 829, 841 (8th Cir. 2006), which the R&R also cites for the proposition that "outrageous conduct only applies to entrapment cases similarly applied the standard that "Outrageous government conduct that shocks the conscience can require dismissal of a criminal charge, but only if it falls within the 'narrow band' of the 'most intolerable government conduct.'" (citing United States v. Pardue, 983 F.2d 843, 847 (8th Cir. 1993)). While Boone also recognized that outrageous conduct has been applied almost exclusively to entrapment cases, it made no such actual holding. Id. at 842. Since it held that the defendant's allegations were not credible and the allegations were not in any event sufficient to shock the conscience, the discussion of the application to entrapment cases is still dicta. Id. at 841-42.

It is also important to note that entrapment cases where outrageous conduct has been applied have been based on the government manufacturing crimes, "where law enforcement officers have sought to create crimes in order to lure a defendant into illegal activity that 'she was not otherwise ready and willing to commit.'" Boone, 437 F.3d at

842(citing United States v. Lard, 734 F.2d 1290, 1297 (8th Cir. 1984)). Part of the outrageous conduct in the instant case was that the ICE agents effectively did manufacture the alleged criminal offense. By stopping Mr. Ramirez without any substantive basis and through racial profiling, and then abusing and intruding upon him and violently knocking his phone out of his hand, the agents provoked Mr. Ramirez. They thereby lured him into an allegedly illegal act that he was not otherwise ready and willing to commit.

The ultimate determinative question is not whether the government legally entrapped Mr. Ramirez but whether they engaged in conduct that shocked the conscience. Outrageous conduct "offend(s) the community's sense of fair play and decency." Rochin, 342 U.S. at 173. The R&R's analysis makes clear that the government's conduct in the instant case meets the constitutional standard for outrageous conduct described by the Supreme Court and recognized by the 8th Circuit. The Magistrate Judge's conclusion that the "Government's conduct is outrageous in the ordinary sense" (Doc. 64 at 1) also makes the conduct outrageous in the legal sense.

As the R&R noted,

> Unable to secure the arrest of the person they came for, ICE agents, without probable cause, pursued and forcibly arrested defendant Jose Roberto Ramirez—a United States citizen who happened to be in the neighborhood and “matched' the generic description of the wanted man—“medium complexion, black hair.”

(Doc. 64 at 1). Further, the government was violently abusive toward Mr. Ramirez which escalated the confrontation. After stopping Mr. Ramirez based on racial profiling, officers intrusively and involuntarily opened the door to the vehicle in which he was a passenger, then violently knocked the phone out of his hand, and they violently removed him from the vehicle. The video taken by Mr. Ramirez's aunt, Defense Exhibit 2, shows how officers were violent and brutal in their treatment of Mr. Ramirez.

And what clearly distinguishes this case is the larger context. The testimony by deportation officer Rivera established that the activities by him and other officers were part of a massive racial profiling operation and that Mr. Ramirez was a specific victim. This reality is well-documented by authoritative independent bodies as well as this Court. <u>See e.g.</u> Human Rights Watch, <u>"A Manufactured Crisis" Minnesota Communities Terrorized by the Federal Government</u>, 2026, www.hrw.org/sites/default/files/media_2026/06/us_minneapolis0626%20web_0.pdf As Human Rights Watch's summary explained, " The Trump administration's deployment of thousands of federal immigration agents to Minnesota between December 2025 and March 2026 led to widespread human rights violations, terrorized residents with long-lasting effects, and spotlighted the deeply abusive patterns in US immigration enforcement."www.hrw.org/news/2026/06/18/us-federal-government-terrorized-minnesota-communities . The report specifically noted, "Federal agents appear to have engaged in widespread and routine racial profiling by stopping, arresting, or detaining individuals on

the basis of their race or ethnicity." A Manufactured Crisis at 31. "Minnesota residents of Somali and Latin American descent were notably targeted, despite the fact that the overwhelming majority of these communities are US citizens or have green cards." Id. at 32.

This Court has specifically found that residents were systematically stopped and questioned based on race and ethnicity. Findings of Fact and Conclusions of Law, Hussen v. Noem, Case No. 0:26-cv-00324 (D. Minn., filed March 9, 2026), pp. 75-77, 93. Other cases have also found substantial human rights violations perpetrated as part of Operation Metro Surge. See Minnesota v. Noem, 818 F. Supp. 3d 1030 (D. Minn. 2026); Tincher v. Noem, 816 F. Supp. 3d 931 (D. Minn. 2026). As Human Rights Watch's summary explained, " The Trump administration's deployment of thousands of federal immigration agents to Minnesota between December 2025 and March 2026 led to widespread human rights violations, terrorized residents with long-lasting effects, and spotlighted the deeply abusive patterns in US immigration enforcement." www.hrw.org/news/2026/06/18/us-federal-government-terrorized-minnesota-communities. This Court found in a civil lawsuit challenging the federal government's actions:

> Plaintiffs have made a strong showing that Operation Metro Surge has had, and will likely continue to have, profound and even heartbreaking, consequences on the State of Minnesota, the Twin Cities, and Minnesotans. Since Operation Metro Surge began, there have been multiple shootings of Minnesota residents by federal immigration enforcement agents. Additionally, there is evidence that ICE and CBP agents have engaged in racial profiling, excessive use of force, and other harmful actions.

Minnesota v. Noem, 818 F.Supp.3d at 1048.

In a recent decision, this Court issued a rare ruling granting a motion to quash the federal government's grand jury subpoenas for records from state and municipal offices of Minnesota elected officials regarding their responses to Operation Metro Surge. In re Subpoenas, 2026 U.S. Dist. LEXIS 139487 (D. Minn, June 22, 2026). Judge Schiltz noted in his decision, "During the surge, there were widespread reports of DHS agents engaging in abusive and dangerous tactics seemingly designed to escalate tensions and destabilize the community." Id. at *4.

Mr. Ramirez was one of countless victims of the Trump regime's fascist and racist terror campaign against residents of the Twin Cities area. He personally suffered outrageous conduct, and the outrageousness of the government's conduct is greatly compounded by the fact that it was part of a massive operation that violently and deliberately attacked the community. Under the standards set forth in applicable case law, this is the sort of extraordinary case of government misconduct that justifies a finding that the government's violation of Mr. Ramirez's substantive due process rights was so egregious as to warrant dismissal.

## II. ALL EVIDENCE RESULTING FROM THE UNLAWFUL STOP AND SEIZURE MUST BE SUPPRESSED.

The R&R correctly concluded that ICE agents' stop of Mr. Ramirez was not supported by reasonable suspicion. It recommends that evidence "up until the moment he struck Agent Rivera - should be suppressed as obtained in violation of the Fourth

Amendment." (Doc. 64 at 21). The Magistrate Judge erred in his conclusion that Mr. Ramirez's alleged action of striking Rivera broke "the exclusionary rule's chain of causation" thereby negating the exclusion of evidence after that time. (Id.) This conclusion is erroneous because it does not account for the fact established by the evidence that Mr. Ramirez act of resistance to Agent Rivera was in direct reaction to and in defense of the illegal stop and violent seizure.

The cases relied on in the R&R are distinguishable. in United States v. Pickens, 58 F.4th 983, 988 (8th Cir. 2023), the defendant "fled when police attempted to stop him . . .leading them on a hazardous high-speed chase that provided probable cause to arrest Pickens for resisting arrest, failing to stop after a collision, and reckless driving." Unlike the instant case, Pickens was not trying to protect himself from violent actions by the police, and further he engaged in dangerous actions that were separate from any self-protection. It is also critical to note that Pickens' holding was based on plain error review where the error in the lower court's decision had to be "an obvious error that affected his substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. Pickens therefore rule against the defendant based on a far more stringent standard than applicable in the instant case.

In United States v. Dawdy, 46 F.3d 1427, 1429 (1995), which the R&R also cites, when "the trooper tried to handcuff him, however, he resisted, and during the ensuing scuffle." This case again differs because the officer was engaging in a normal process of

detention rather than assaultive conduct as in the instant case. Further, since Dawdy had already found probable cause of the arrest, the discussion about whether the resistance was an independent justification was dicta. Id. at 1430-31. The dissent was also instructive in its contention that "the fact that probable cause is to be judged objectively does not transform Dawdy's momentary scuffle into an attenuating event sufficient to purge the taint of the original illegal stop and the subsequent search." Id. at 1436. The dissent pointed out there was no time lapse to temporally separate the resistance from the illegal stop and tainted arrest, and that a "momentary scuffle" "was not a sufficient 'intervening circumstance' to break the causal chain that lead to the subsequent search." Id. similarly in the instant case there was no time lapse between the actions constituting an illegal seizure and Mr. Ramirez's resistance, and the resistance was less than momentary.

Significantly, the R&R did not address Mr. Ramirez's specific argument supported by binding authority that his alleged resistance was justified under the circumstances of this case, and therefore did not justify suspension of the exclusionary rule. As discussed, the action that gives rise to the charge in this case occurred as a result of the improper racial profiling stop, and the further intrusive conduct by officers when they involuntarily opened the door to the vehicle and Rivera then knocked Ramirez's cell phone out of his hand. Although force is generally not justified to resist arrest, "an individual may be justified in using force to resist excessive force used by a law enforcement officer."

United States v. Drapeau, 644 F.3d 646, 654 (8th Cir. 2011)(citing United States v. Taken Alive, 262 F.3d 711, 714 (8th Cir. 2011). The Supreme Court has applied in criminal case he common law rule that "if the officer have no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest."Bad Elk v. United States, 177 U.S. 529, 535 (1900); see also Von Kahl v. United States, 242 F.3d 783, 790 (8th Cir. 2001)(recognizing the common law right set forth in Bad Elk without addressing whether it is still good law).

Mr. Ramirez reacted to the racial profiling by federal officers based on fear that he would be the next Renee Good whom immigration officers had murdered the previous day. When officer opened the door to Mr. Ramirez's vehicle without consent, and then violently knocked the cell phone out of his hand, Mr. Ramirez reflexively hit officer Rivera in self-defense. His actions were reasonable and authorized under the law, and should not serve as a basis to excuse the violations of is Fourth and Fourteenth Amendment rights.

## III. THE MILITARY PROSECUTOR MUST BE DISQUALIFIED.

The Magistrate Judge's Order denied Mr. Ramirez's original motion to disqualify military lawyers (JAG) from appearing in this case.[1] Mr. Ramirez respectfully submits

[1] The Magistrate Judge noted that the JAG lawyer on the case at the time of the original motion was subsequently replaced by another SAUSA. Based on the Magistrate Judge's review of the record, there have been four prosecutors assigned to this case. The Magistrate correctly decided that the issue was not moot because similar arguments could be

that the Magistrate Judge gave short shrift to the sophisticated arguments raised in his memorandum and the copy of the amicus brief filed in another case. Mr. Ramirez hereby incorporates by reference his arguments in his post-hearing memorandum (Doc. 54 at 13-29), and his original motion and attachment. (Docs. 29).

## CONCLUSION

For the foregoing reasons, Mr. Ramirez respectfully requests that the Court overrule the Recommendations and Order of the Magistrate Judge, and grant his motion to dismiss this case, or in the alternative to grant his motion to suppress evidence in its entirety, and to disqualify military counsel.

Dated: September 11, 2026

LAW OFFICE OF JORDAN S. KUSHNER

By s/Jordan S. Kushner

JORDAN S. KUSHNER
Attorney ID 219307
Attorney for Defendant
431 South 7th Street, Suite 2446
Minneapolis, Minnesota 55415
(612) 288-0545
jskushner@gmail.com

---

made against other SAUSAs or the military lawyers previously assigned to the case could taint the prosecution. Undersigned counsel knows that at least three of the SAUSAs assigned to this case are JAGs, and is not sure about the other.